In re MESABA AVIATION, INC., dba Mesaba Airlines, Debtor.

No. 05–39258.

United States Bankruptcy Court, D. Minnesota.

Sept. 22, 2006.

See also 341 B.R. 693.

Kenneth B. Hipp, Marr Hipp Jones & Wang LLLP, Honolulu, HI, Alan L. Kildow, DLA Piper Rudnick Gray Cary, Michael F. McGrath, Michael L. Meyer, Will R. Tansey, Ravich Meyer Kirkman & McGrath Nauman, Thomas Lallier, Foley & Mansfield P.L.L.P., Minneapolis, MN, Connie Lahn, Fafinski Mark & Johnson, P.A., Eden Prairie, MN, Craig D. Hansen, Squire Sanders & Dempsey LLP, Phoenix, AZ, Scott A. Kane, Stephen D. Lerner, Gregory A. Ruehlmann, Squire Sanders & Dempsey LLP, Cincinnati, OH, Tim J. Robinson, Aquire Sanders & Dempsey LLP, Columbus, OH, for Debtor.

**ORDER ON REMAND, RE: DEBTOR'S RENEWED MOTION FOR AUTHORITY TO REJECT COLLECTIVE BARGAINING AGREEMENTS**

GREGORY F. KISHEL, Chief Judge.

This Chapter 11 case is before the Court, in chambers, on remand from the

United States District Court pursuant to the Memorandum of Law and Order entered on September 13, 2006, by Judge Michael J. Davis of that court. The matter at bar is the Debtor's second motion under 11 U.S.C. § 1113, for authority to reject its collective bargaining agreements with the Air Line Pilots Association, International, the Association of Flight Attendants–CWA, AFL–CIO, and the Aircraft Mechanics Fraternal Association (collectively, "the Unions"). This Court granted that motion under an order entered on July 14, 2006. The order was based on a memorialization of decision recited on the record at a hearing held earlier that day, as well as the memorandum decision in which the Court denied the Debtor's first such motion, *In re Mesaba Aviation, Inc.*, 341 B.R. 693 (Bankr.D.Minn.2006). The Unions took an appeal from that order. The District Court administered the appeal on an expedited basis, resulting in Judge Davis's recent decision.

In his Memorandum, and in great detail, Judge Davis affirmed this Court's rulings on all of the most significant issues raised by the Debtor's motion: the necessity of the Debtor's proposed 19.4% reduction in aggregate labor costs to permit its reorganization under Chapter 11 (including the necessity of a projected 8% target post-modification operating margin in the calculus from which the need for that 19.4% reduction was determined); the necessity of a six-year duration for the downward modification of the Debtor's labor cost structure and the reduction in wages and benefits payable to the Unions' members; the completeness and reliability of the information in which the Debtor based its second set of proposals to the Unions under § 1113; the relevance and adequacy of information provided to the Unions after the Debtor made those proposals, to enable them to evaluate them; the reason-

ableness of the Debtor's arrangements in meeting with the Unions for negotiation on the second set of proposals; the absence of good cause for the Unions' rejection of the Debtor's proposal, to the extent that the rejection was based on the 19.4% depth of cut and the six-year duration; and the weighting of the equities in favor of allowing the Debtor to reject the collective bargaining agreements, given the near-certainty that the Debtor would have to terminate its going-concern operations if it is unable to achieve the target labor cost reductions. Further, Judge Davis affirmed an earlier ruling by this Court, which had barred the Unions from raising, as an issue in the context of the Debtor's motion under § 1113, the fact that the Debtor had made substantial pre-petition distributions of dividends to MAIR Holdings, Inc. ("MAIR"), its sole shareholder, and the possible avoidability of those transfers under bankruptcy law.

Judge Davis found reversible error in only two of the component rulings that underlay the July 14 order.

He cast both under the more general statutory requirement of § 1113(b)(2), that the Debtor confer in good faith with the Unions in further negotiation after it made its proposals for modification. Both of these points spring from the substantive content of the Debtor's initial proposal. The Unions faulted the Debtor for its refusal to amend its proposal to include additional terms to qualify the content and implementation of a concessionary structure of wages and benefits. Judge Davis agreed with them, and reversed the July 14, 2006 order on its supporting rulings "with regard to their analysis and holdings related to the fair and equitable factor and the good faith negotiation of snap-back provisions." However, *he reversed on the*

*basis of those subsidiary rulings alone.*[1] He remanded the matter "for further proceedings consistent with [his] opinion."

That leaves this Court to address only two issues, in light of Judge Davis's prevailing legal analysis on them. Though there is precious little case-law development as to one, and essentially none as to the other, neither is insuperable of treatment—and in a straightforward fashion, given the guidance in the District Court's memorandum.

### 1. Debtor's Refusal to Bargain Over Possible Snap-back Provisions in Structure of Concessions.

During the parties' pre- and post-motion negotiations under § 1113, the Unions asked the Debtor to include "snap-back" provisions in its proposals.[2] The Debtor would not negotiate on this issue, flatly refusing to include any such term in any final package of modifications. For the proceedings before this Court, the Unions painted this refusal as the badge of a lack of good faith on the Debtor's part, in violation of its obligation to confer under § 1113(b)(2). The Debtor's response was that there was no function to be served by including snap-back provisions as to the Unions, since they simply would not be capable of activation in the very different contractual environment that it was almost certain to enter if it managed to keep any regional flying for Northwest Airlines or to gain any such from another carrier on a long-term basis. The Debtor also maintained that a snap-back that triggered the reopening of negotiation on wage and benefit terms would be destabilizing to its operations, in the very vulnerable market position that it forecast for itself, by making its long-term cost structure uncertain.

This Court agreed with the Debtor in both the decision on the first motion, 341 B.R. at 743, and the decision on the second. On appeal, Judge Davis concluded that there was "no admissible evidence in the record to support ... the conclusion that inclusion of snapbacks would be futile and would hinder [the Debtor's] reorganization." Memorandum of Law and Order ("Memorandum") at 39. He also found that the record lacked "any evidence that snapbacks would be so detrimental to ... reorganization that [the Debtor's] complete failure to consider them was justified." *Id.* Thus, he ruled that the Debtor "demonstrated bad faith by wholly refusing to negotiate regarding snapbacks," Memorandum at 39–40, meriting reversal of the July 14, 2006 order as to that element of the Debtor's case, Memorandum at 53–54.

However, in a footnote Judge Davis made it clear that he was "not deciding that [the Debtor] *must* include snapbacks in its Proposals; it is possible that the absence of snapbacks might be justified." Memorandum at 40 n. 4 (emphasis added). He did suggest that their "inclusion ... might be a large step towards reaching mutual agreement and cultivating trust with the Unions." *Id.*

---

1. In public pronouncements made since the District Court's opinion was released, spokespeople and counsel for the Unions have used language that projects the semblance of a much stronger legal position under § 1113 than their constituents actually hold under the appellate rulings.

2. As noted in the decision on the Debtor's first motion, a "snap-back" provision is a labor negotiation term used to describe a provision that "would provide for an automatic restoration of pre- § 1113 wage or benefit provisions if the Debtor's operations returned to a state of solvency sufficient to fund them, or for a reopening of negotiations on these terms upon a designated level of improvement in the Debtor's financial condition." 341 B.R. at 743.

Clearly, Judge Davis saw the inclusion of snap-backs as a discrete unit of value that was nearly indispensable to the global give-and-take of continued bargaining under § 1113. Perhaps they would be an element for the Unions to surrender in exchange for some other sort of benefit, perhaps they were to be granted by the Debtor in one variant as a harmless "hollow promise" with symbolic significance alone.[3] Judge Davis expressly left it open to the Debtor to better prove that inclusion of snap-backs in a concessionary package would truly jeopardize its future financial stability, in some appropriate context on remand. But he also expected the Debtor to accept their presence as one chit at play in comprehensive bargaining, not to reject them out of hand, and to show that a refusal to include them by the *end* of bargaining under § 1113 was substantially justified by their lack of utility to reorganization. Clearly, he left food for thought for the Debtor and the Unions alike on the issue, with the results to be put into application in both bargaining and any renewed presentation to this Court.

## 2. Absence of Specific Treatment of MAIR's Interest in Debtor's Proposal for Cost Reduction and Sharing of Post–Reorganization Burdens.

In defending the Debtor's second motion, the Unions noted that the Debtor had done nothing *de jure* to limit the pecuniary rights of its sole shareholder, MAIR, as a part of the cost-savings measures it had implemented before it turned to concessions from the Unions. Nor, the Unions complained, had the Debtor proposed in the context of its renewed motion to formally impose any financial burden, limit any legal rights, or reduce any sort of current or future out-of-pocket expenditure to MAIR or for its benefit.

The Unions had not raised this issue, framed as such, in the proceedings on the

---

**3.** A grant of the sort of snap-back that entails an actual, automatic restoration to a designated level of compensation *upon a specified enhancement of profit* might be an easy way for the Debtor to buy peace on this emotionally-fraught point . . . not to mention a defusing of the good-faith issue in which it was analyzed by the courts. If its actual activation in a future regional flying environment is truly as improbable as the Debtor insists, this sort of snap-back would never actually jeopardize reorganization; its predicate recovery to an enabling level of profitability would simply not be permitted by a mainline airlink partner. Notwithstanding the Unions' rhetorical posturing on this issue, there was abundant and wholly uncontroverted evidence of the vanishingly small chance of a return to an operating margin of more than 8%. That evidence virtually compelled this Court's findings to that effect, 341 B.R. at 732, 743, and 746. (Some of the rather pointed and uncontroverted evidence to support this conclusion was received under seal; hence, recapitulating it here is not appropriate.) The District Court apparently did not consider this particular evidence to be pivotal on the issue of the Debtor's good faith in bargaining. And, probably, this Court's use of the adjective "futile" to describe the consequence of including snap-back provisions was denotatively inaccurate; it may well have detoured the argument in tenor and structure. Judge Davis's apparent point, that *proffering* snap-backs would not be "futile," is perfectly sound in this light, as long as one recognizes their *present* benefit as mainly symbolic and their future consequence (if structured accurately by triggering event) as entailing relatively low risk to the Debtor's financial stability; if somehow the Debtor *did* get to a greater profit margin, a properly-calibrated automatic snap-back could be taken in stride. However, the sort of snap-back that would only trigger the renewal of grinding, distracting management-labor bargaining, in the style of the Railway Labor Act, might not be at all benign, if the nominal trigger were not of a sufficiently long-term nature. Such bargaining would distract management and labor alike from the resurgent marketplace and operational challenges that might follow, or even bode to jeopardize the Debtor's performance under an airline service agreement.

Debtor's first motion. The wording used in their briefing for the second motion was very broad-brushed; there was no concrete suggestion or demand as to what exactly the Debtor should do in relation to MAIR's interest. However emotionally the position was argued during the hearing on the second motion, it never reached an articulation more precise than that.

The Debtor and its counsel took this argument as a demand that the Debtor promise, as part of an accord under § 1113, to cancel MAIR's equity interest under a plan of reorganization, or something of the sort. The Debtor argued that it was simply too early in a very rocky process of reorganization to consider what to do with MAIR's interest, before the overwhelming issues of future operational costs were resolved.

The Unions' counsel never came back with a significant refinement of what their clients were really driving at. Thus, it was entirely too easy to see the issue as a continuation of the ad hominem, personality-oriented rhetoric on MAIR's past involvement with the Debtor that had suffused the proceedings on the first motion, 341 B.R. at 737–738 n. 60 and 741–and to dismiss it for want of focus.

The Unions' counsel seem to have sharpened their pencils during the appellate process, driving at the point that it was the Debtor's burden in the first instance under § 1113(b)(1)(A) to seek concessions from every constituency in the case, such that "all of the affected parties are treated fairly and equitably" against the backdrop of modification of the Unions' collective bargaining agreements. Ultimately, Judge Davis agreed with them, to the extent of finding that "MAIR is a major player in this bankruptcy," Memorandum at 44, as to which the Debtor "had the obligation to at least address the effects of reorganization on" it, *id.* He held that

"any sacrifices that MAIR may be asked to make in this reorganization" were indeed relevant to the question of whether the Debtor's § 1113 proposals to the Unions were part of an overall structure of reorganization that "fairly and equitably" treated all affected parties. Memorandum at 45. In short, as to the record made on the second motion, he held that the Debtor could not "avoid its burden under this factor [of § 1113(b)(1)(A)] by failing to present any evidence of any effect on MAIR whatsoever." *Id.* Thus, he reversed the July 14 order to the extent that it had not required the Debtor to further develop a response to the Unions' point that MAIR was absent from the overall regime of concessions that the Debtor then proposed to ensure its future solvency, as part of its case under the fair-and-equitable requirement. Memorandum at 53–54.

Judge Davis made no specific ruling or observation about the nature of any proposed treatment of MAIR's interest that might satisfy this element, in context. However, he clearly felt it was incumbent on the Debtor to do *something vis-a-vis* MAIR's equity interest. And his ultimate concern, while not pointedly voiced, can be gleaned from his highlighted and twice-made observation: Northwest Airlines, the force that visited the Debtor's financial crisis on it immediately after entering the Omnibus ASA, is a substantial minority shareholder in MAIR, with power to increase its equity stake, and also has other potential control over both MAIR and the Debtor. Memorandum at 4 and 44 n. 5.

So what was the point? It seems to have been that Northwest Airlines, as a shareholder in the publicly-held MAIR, stood to gain directly from any generation of post-reorganization profits by the Debtor that might be paid over to MAIR, as substantial "management fees" or as divi-

dend payments.[4] In context, this possibility has significance under § 1113 because the production of those profits would be enabled, in part, by the reduction in the cost to the Debtor of employees' wages and benefits, in the wake of rejection of the collective bargaining agreements and imposition of non-consensual modifications.[5]

Why the Unions' counsel just did not say as much during argument, and then make the logical demand, is a mystery. Regardless, the drift of Judge Davis's analysis is clear: at least one way in which to make equity share the burden of the overall restructuring, to parcel out the pain in some measure commensurate to what was being asked of employees, was to prohibit the payment of shareholder dividends to MAIR for the duration of the concessionary labor cost structure, and to take some steps to ensure that payment of monies to MAIR in any other nominal form was in consideration of equivalent value contemporaneously received from MAIR, for services or goods that otherwise would be purchased from a third party.[6]

A measure like this would do much to avoid the semblance that the Unions so vehemently opposed, and even its actualization: having MAIR extract future profit out of the Debtor that was traceable to the value of contractual entitlements that the Debtor had stripped from unionized employees.

This, of course, is only one possibility as to what the District Court's concrete concerns were, and only one showing that the Debtor could offer to meet the Unions' hot but unilluminating original objection. There may be others, which would be the subject of renewed bargaining or a further pitch to this Court in some post-appeal context.[7]

In a very real way, the suggested treatment would do legitimate service to the prioritization of claims against any artificial business entity, under bankruptcy or non-bankruptcy law, as was recognized in this Court's decision on the Debtor's first motion. 341 B.R. at 740 n. 63.[8] Clearly, Judge Davis's disposition—remand, rather than outright reversal—meant that he expected the parties to take up the issue and to advance it in light of his analysis. The

---

4. The idea being that MAIR then could distribute those receipts in whole or in part to its own shareholders of record, as dividends.

5. This Court recognized that flow-through effect, in a different context, in the decision on the Debtor's first motion. 341 B.R. at 741 n. 64.

6. To make it absolutely clear: this is talking about the "management fees" denominated as such, that the Debtor has paid to MAIR in large amounts from time to time, ostensibly in return for the expertise of Paul Foley and other MAIR executives.

7. The one just noted could be transplanted into a plan of reorganization pretty handily, were the Debtor to first propose that MAIR retain its equity interest. The alternative argued quite windily at the second hearing, canceling MAIR's shareholding, is truly pre-

mature for consideration. Among other reasons, there is no evidence that any one or any thing is in prospect to take MAIR's place as shareholder, via a new capital infusion—and under state law monied corporations always need at least one shareholder.

8. This prioritization directs the allocation of the value inherent in a corporation or other such entity. It always places the shareholders, the ownership interests, at the bottom, in recognition of the risk assumed earliest by equity investment, as well as the superior expectations of creditors who consentually contract with the corporation after its formation. In a going-concern scenario, labor unions factor into this prioritization the same as any other ongoing contractor would—they have a justifiable expectation to be paid out of ongoing revenues, in full per contract, before subordinate shareholders are to receive anything from the operational surplus.

present discussion is an attempt to share this Court's thoughts on that analysis, for that effort.

### 3. What Next?

Obviously, Judge Davis intended that the July 14 order be vacated, for want of a complete showing by the Debtor on the elements of § 1113 in the unique context of this case. But he did not specify whether the Debtor was to be relegated to making a third motion (he certainly did not direct the entry of an order denying the second motion) and he did not speak to whether the Debtor could somehow remedy its record in the context of the second motion, upon a reopening of proceedings. In passing on the issues posed by the second motion, he did take cognizance of the Debtor's showings for the first motion, as well as this Court's first decision. So, there is some tangential support for the latter.

■■■ In the absence of an overt directive, it is open to this Court to reopen the evidentiary record on remand, to receive probative evidence that would be logically responsive to the District Court's analysis. *Confederated Tribes of Warm Springs Reservation v. United States,* 101 Fed.Appx. 818, 822–823 (Fed.Cir.2004); *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1379–1380 (Fed.Cir.1999); *Blinzler v. Marriott Internat'l, Inc.,* 81 F.3d 1148, 1160 (1 st Cir.1996). The determination whether to reopen the record on remand is committed to the trial court's discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–333, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *In re Washington Pub. Power Supply Sys. Securities Litig.,* 19 F.3d 1291, 1302 (9th Cir.1994).

There is very little refined analysis of the highly-tensioned dynamic of proceedings under § 1113, in which bargaining akin to mainstream labor negotiations is expressly played out concurrently against a pitched adversarial process of litigation and presentation to a court for a winner-take-all result. More to the point here, there is nothing at all in the authorities to give guidance as to how to handle the matter of a record in the present posture of this case, and what indeed is relevant to consideration. Very few reported cases have spoken to the issue of whether the court may consider events occurring after the filing of a motion under § 1113 (such as the provision of additional information, the conducting of more bargaining, or even the amendment of debtors' proposals) or whether the record must be limited to events from before that filing; and there are decisions for both propositions.

This case is now complicated by the overlay of a reversal on appeal and a remand, all after the original trial-court record was closed. That latter conundrum can be addressed under the authorities cited above. For the record, this Court would allow the reopening of the record on the Debtor's second motion. This does not resolve the questions of what the Debtor has to do to tee up the two remaining issues on that motion, or whether it even can do so at this point as a matter of substantive law. Those questions, however, cannot be addressed in the current state of vacuum.

That manifest uncertainty given, it is most appropriate to leave it up to the Debtor, as returning appellee, to take the first step on going forward. If the Debtor believes a third motion is the appropriate vehicle to remedy all the defects after an abbreviated effort at another round of pre-motion bargaining under § 1113, it may withdraw its second motion (which would be rendered "pending" once again, by the vacating of the July 14 order). Then it may start the process anew, on as expedit-

ed a basis as warranted by the current exigencies.[9] If, on the other hand, it has a theory to make a presentation on these two points legally viable in the context of a reopened proceeding on its second motion, after some activity outside the court in relation to the Unions or not, it may set that matter back on for hearing at an appropriate date, present its evidence and argument, and all parties will go from there.

On the basis of Judge Davis's rulings, and the memorandum just memorialized,

IT IS HEREBY ORDERED:

1. The order of July 14, 2006, which granted the Debtor's renewed motion under 11 U.S.C. § 1113, is vacated.

2. The Debtor's renewed motion for relief under 11 U.S.C. § 1113 will remain pending until such time as the Debtor withdraws it, the Debtor and the Unions have entered into a comprehensive settlement, or this Court closes a reopened record and then makes a decision on it.

---

9. At the last hearing in open court in this case, on September 12, the Debtor's counsel advised that his client had around $10,000,000.00 in available cash left, and that the Debtor was currently losing approximately $1,000,000.00 per week as a result of the persistence of fixed costs against the severe reduction of revenues occasioned by Northwest Airlines withdrawing aircraft from the Debtor's fleet. The Court has authorized the Debtor to obtain post-petition financing. However, the representation has been that the lender will not advance until the Debtor has had decisive action on the matter of labor cost reductions. Time has always been of the essence in this case—but never more than now.